ADA H. FOOTE, appellant,

*v.*

HENRY H. FOOTE, respondent.

[Argued March 20th, 1906. Decided November 26th, 1906.]

1. In a suit for divorce, evidence considered, and *held* sufficient to show desertion.

2. To constitute desertion, it is not necessary that the intent to desert should have been formed at the time the party left his home, but it is sufficient if he afterwards determines to desert, and persists in such determination.

3. Under a statute requiring corroborative evidence of desertion in order to obtain a divorce, testimony of other witnesses is not required; but it is sufficient if the circumstances, as shown by the expressions and conduct of the defendant, together with the letters of the parties, corroborate the testimony of the complainant.

On appeal from the decree of the court of chancery refusing a divorce, and advised by Vice-Chancellor Stevenson.

*Mr. Cortlandt Parker,* for the appellant.

*Mr. Henry C. Pitney, Jr.,* for the respondent.

The opinion of the court was delivered by

VROOM, J.

The bill in this case was filed by the appellant on July 30th, 1903, praying divorce on the ground of desertion, and charged that the defendant for more than two years then last past had willfully, continuedly and obstinately deserted her, without any just cause or justification therefor. To this bill the defendant filed an answer denying the desertion charged, and he also filed a cross-bill praying for a divorce on the ground of an alleged desertion of him on the part of the complainant. The defend-

ant failed to appear at the taking of depositions and offered no evidence to sustain either his answer or cross-bill.

The parties to this suit were married at Elizabeth, N. J., on the 12th day of October, 1886, and continued to reside there until June, 1891. They lived first with the mother of the complainant, subsequently in houses rented by the defendant until the year 1890, when they moved into a house built with money given to complainant by her mother, and there they lived until June, 1891. The defendant had been employed in the office of Kountze Brothers, in New York City, at a salary of $2,000 per annum, and this position he lost in the early part of 1891. At this time a mortgage of $1,000, in addition to a mortgage of $2,000 used in completing the house, was placed upon it to pay the debts of the defendant. After losing his position defendant did nothing to gain a living, and he not being employed, they broke up housekeeping; this was in June, 1891. The house was left vacant, complainant by invitation went to her mother's house and defendant to his mother's house in Elizabeth. One child, a daughter, was born November 23d, 1889, still living, and who is and has been with her mother.

In June, 1892, the defendant went to Laredos, Texas, for the purpose of managing an electric plant there. This move was with the consent and knowledge of the complainant, and it was the intention, as she hoped, to join him and live there. He remained in Texas until September, 1893, when he returned to Elizabeth and to his mother's house. And it appeared that during the entire period of his residence in Texas the complainant received from him for the support of herself and child only the sum of $50; of this sum she applied $7 for her child's use, the balance she applied to the payment of debts of the defendant.

After reaching Texas, in 1892, the defendant wrote to his wife, as she testifies, about every two weeks, until August 11th, 1892. These letters were in evidence and show that the defendant was doing well in his position there, and these letters may be termed, as on the argument they were, "kindly, if not proportionately loving," but there was not in them a word of her coming to Texas or of the probabilities of his supporting her. That the complainant was willing to go to Texas appears, and that

she was to go was a part of the arrangement under which she gave her consent to his going.

After his letter of August 11th, 1892, from Laredos, Texas, he ceased writing, and in fact did not write to his wife again until September 17th, 1893. After writing to him six or seven letters which remained unanswered, she wrote him, January 5th, 1893, withdrawing her consent to his remaining longer: This letter is important, and is as follows:

"DEAR HARRY—It is now five months since I have heard from you. Will you not be kind enough to tell me in what state of mind you expect me to spend the rest of my life? I gave my approval when you proposed Laredos, trusting it would prove conducive to the comfort of both of us. I now withdraw my consent to your remaining any longer.

"Very sincerely,

"ADA HENDERSON FOOTE."

This letter was sent defendant by registered mail and received by him, as appeared from the registry return receipt. To it he made no reply.

Prior, however, to the sending of this letter the complainant wrote to her husband the following letter, which was sent him by registered mail and received by him:

"MY DEAR HARRY—It is now eleven weeks since I have had a line from you. In this time I have written and mailed you, this makes seven letters. I understand that letters have been received from you by a member of the family; from the silence I judge no message was sent to your wife or child. Can it be possible you are so ill or disabled as not to be able to write? Is there no one who will use a pen for you? Can you give me an explanation of your silence?

"YOUR WIFE.

"P. S.—I hope that you will arrange for the payment of the interest which falls due on the 4th of December. My house rent does not cover this, as three hundred dollars have already been drawn and mama is quite unable to pay in advance. Recollect I have never considered this my debt. I signed the mortgage to relieve you of temporary embarrassment, and do not expect to be placed in an embarrassing position myself.

"A. H. F."

This letter was also unanswered.

On September 17th, 1893, the defendant writes to his wife, after this long silence, and announces that he is about to return home; not a word to account for his failure to write to com-

plainant for over a year, but asking whether "it is possible for him to obtain forgiveness for what I have not done," and expressing obligations to the mother of his wife for her kindness to complainant and his child. This letter was received by complainant while at her mother's house in Pine Hill, New York, where it was addressed. To it no reply was made, and after defendant's conduct toward her none could have been expected. Defendant did not seek her out, either at Pine Hill, or later, at her house in Elizabeth, when she returned there, and she did not even see him on the street until the following March, 1894. He was in Elizabeth, at his mother's house, as complainant knew, but he failed to go to her or provide, or attempt to provide, in any way for her support.

Meeting defendant on the street, in March, she bowed to him; this was on the Wednesday before Easter Sunday. On this same day he wrote and made the request of complainant that she should take her Easter communion with him at Christ church, and at the seven o'clock celebration; that he would meet her on the street and go with her. To this complainant properly and indignantly replied that

"before consenting to your proposition to take the Holy Sacrament with you on Sunday next I would rather have a few minutes' conversation with you. It seems to me that after such a separation as we have had, nearly two years, I would choose to have the meeting here, and not on the street. Come here to my mother's house at eight o'clock this evening, when I feel sure there will be no interruptions."

Defendant went to the house of Mrs. Henderson, as requested, and, as appears from the evidence, when requested by his wife to give her some explanation of the long time he had been away, and all the time he had been in Elizabeth and his failure to write or to come and see complainant, she testified, on being asked what did he say:

"He made no answers, except 'Nothing,' 'I don't know,' and then said he must go. I said, 'But why must you go? This may be the chance of your life; it is the chance of your life. Why cannot you tell me why you have been away from me and neglected me for these years and deserted me?' He said that he had to go; that he had made an appointment with the organist; that he had to go, and so he went."

This stands without contradiction in the case. The defendant had set up in his cross-bill that he had no opportunity to talk privately with his wife, by reason of the presence of the mother and brothers in the room, but even this puerile excuse is set at rest by the testimony of his wife that he could, even with the mother's presence in the room, have had a private conversation with her, had he desired it, and after his conduct to her she could justly say that he might well and unquestionably talk of family matters before one who had been compelled to support her and her child.

After writing some notes to his wife offering to render her assistance and proffers of service, but not doing anything for her or seeing her, she wrote him that she would like to meet him at the house of a friend and a relation of the defendant. She met him, and as she testifies, nothing particularly occurred; that nothing at all was said by him as to taking care of her, and further she testified: "I wished he would say it when I went there; I hoped he would." And being asked if such a thing had occurred and any provisionary offer of provision been made, what would have been her response, she replied: "I would have gone to him gladly."

Subsequently and on May 21st, 1894, defendant wrote to his wife announcing that he was going away on a business trip and expressing a desire to see her for a few minutes. After this his letters ceased and he made no efforts to see his wife, nor did he do anything for her in any way. Finally, in April, 1895, nearly a year having elapsed, she wrote him saying:

"In all your notes to me, over a year ago, by the by, you assure me of your anxiety to do something for me. You can do something for me, and now. Tell me why you so suddenly ceased to be anxious to please me? Have you forgotten that I am your wife?"

To this letter there is no reply, and after that all communications and interviews ceased. No offer was made by defendant to resume marital relations, nor was there any effort made by him to support or provide for his wife and child.

The testimony of her brother corroborates the testimony of

the complainant that defendant never returned to her after his return from Texas, and contributed nothing for her support.

The learned vice-chancellor, in his conclusions filed in the court below, has treated this case as one of constructive desertion, and says that although the husband and wife were separated there was no willful and obstinate desertion committed by either. He imports into the case the notion that what he terms the original separation in 1891 was due to the habitual drunkenness of the defendant, and insists that while the failure of the husband to support his wife, growing out of his habitual drunkenness, may justify the wife in leaving him and prevent the separation so caused from being charged against her as a willful, continued and obstinate desertion, but that it does not follow in such a case that the husband is guilty of such desertion.

But this cause is not one of constructive desertion; the separation in 1891, due to the defendant's loss of employment and inability to maintain his home and family, is not pretended by the complainant to have been the commencement of that actual desertion which forced the complainant, reluctantly, perhaps, to file the bill in this case. At this time there is no evidence in the case of the drunkenness of the defendant, nor did the complainant know why he had lost his position in New York. What she did know was that by reason thereof he was without means of support for her, and that she was obliged to mortgage her house for an additional sum of $1,000 to pay his debts. She was compelled to accept her mother's invitation to go to her house, while the defendant went to reside with his mother.

But there was no separation beyond that; the defendant, with the express consent of the complainant, accepted employment in Texas, and left Elizabeth with the hope of succeeding there and eventually sending for his family. His course there has already been mentioned and the withdrawal by the complainant of her consent to his remaining longer. After a long silence the defendant, in September, 1893, returned to his mother's house in Elizabeth, but not to his wife, nor has he ever returned to her, never offered to resume the marital relation, nor to provide for her as in duty he was bound to do.

This conduct is what constitutes the actual desertion of the

complainant on the part of the defendant. When the intention to desert became fixed in the mind of the defendant the complainant has been unable to say, but his actions and the corroborative circumstances under which the circumstances took place, can leave no doubt that such a determination was reached long prior to the two years before the filing of the bill in this case. As was said in this court in the case of *Carroll* v. *Carroll,* *68 N. J. Eq. 727:* "It is not necessary to begin a desertion that the deserter intends to desert at the time he leaves his home. If the proof establishes that he, at any time while absent from his home, determined that from thenceforth he would desert his wife, and that determination is persisted in willfully, continuously and obstinately for the statutory period, that will constitute desertion within the statute."

I fail to see any foundation for the suggestion made in the opinion below that there was any concealment as to the cause of their separation, so far at least as the complainant is concerned. That she may not be able to state the reason or cause thereof, or even understand the conduct of her husband, is indeed possible, but I fail to find anything in her testimony indicating the suppression of any facts bearing upon her unfortunate position, and to my mind her narrative was frankness itself.

As was said by Lord Penzance, in *Yeatman* v. *Yeatman, L. R. 1 P. & D. 489:* "A wife is entitled to her husband's society and the protection of his name and house in cohabitation. The permanent denial of these rights may be aggravated by leaving her destitute, or mitigated by a liberal provision for her support, but if the cohabitation is put an end to without the consent of the wife and without the intention of renewing it, the matrimonial offence of desertion is, in my judgment, complete."

I am constrained to the belief that the manifestations of affection of the defendant for his wife and child in the letters offered in evidence were absolutely insincere, and I concur with the view of Vice-Chancellor Pitney, in *Coe* v. *Coe, 68 N. J. Eq. 157,* that "the duty of the husband to love and support his wife is a practical duty and not performed by a manifestation of sentiment without corresponding conduct."

The testimony in this case cannot be read without reaching

the conclusion that the complainant was most desirous that her husband should return to her and honestly perform his marital duties towards her. She was entitled to his protection and she was entitled to support both for herself and child. Her last appeal to him, made eight years before the bringing of this suit, and ending with the words, "Have you forgotten I am your wife?" should have awakened the defendant to a sense of the duty he owed to his wife had he not been absolutely determined upon deserting her.

It was further insisted that the corroborative testimony offered by the complainant did not extend to all the essential elements of the matrimonial offence of desertion defined by our statute. It was held in this court, in the case of *McShane* v. *McShane*, *45 N. J. Eq.* (*18 Stew.*) *342,* that a divorce would not be granted on the unsupported testimony of the petitioner as to the cause of the desertion. The same ruling has been had in many other cases in this state. In the *McShane Case* there was absolutely no testimony of any kind as to the desertion save that of the petitioner, and the master, in his opinion, which was approved by this court, adverts to the fact that the petitioner had destroyed the letters written to him by his wife, which he says, in the absence of oral proof, might have been of service to him in that suit. This confirms the view that it is not the testimony of other witnesses that is requisite as corroborative evidence. If the circumstances of the case, as shown by the expressions and conduct of the defendant, together with the letters of the parties, all corroborate the testimony of the complainant, the case is complete. Such a case has, in my opinion, been made here, and I think the decree below should be reversed and the record remitted to the court of chancery with direction to enter a decree granting the divorce as prayed.

*For affirmance*—PITNEY, SWAYZE, GREEN—3.

*For reversal*—THE CHIEF-JUSTICE, GARRISON, FORT, GARRETSON, REED, BOGERT, VREDENBURGH, VROOM, GRAY, DILL—10.